### EXPERT REPORT OF MARIANNE MANN, MD

### MY QUALIFICATIONS

As per the attached CV (Appendix A), I am a physician, board-certified in internal medicine and pulmonary medicine. I obtained my MD in 1986 after completing an accelerated six year BA-MD program at Lehigh University and the Medical College of Pennsylvania. I then trained as a medical resident and fellow for six additional years through 1992. My residency was in internal medicine, and was completed at Albert Einstein Medical Center (Philadelphia), and the University of Connecticut Health Center. My fellowship was in Pulmonary and Critical Care Medicine, completed in 1992 at the University of Connecticut Health Center. From 1992 to 1994, I worked as a clinician largely in the critical care (ICU) setting. As an intensivist, I was familiar with the use of Reglan injectable in treating patients with slow bowel transit (a relatively common problem in patients on tube feeds who are in the ICU). I joined FDA in 1994, but I continued to practice as a physician on a volunteer basis in the Pulmonary Clinic at the National Naval Medical Center (NNMC) in Bethesda, MD through 2004. My responsibilities at the NNMC included seeing patients and teaching residents and fellows.

In 1994, after approximately eight years of clinical training and practice as a physician, I joined FDA. I remained at FDA for nine years through 2003. I began in the Division of Antiviral Drug Products from 1994 to 1997 as a primary medical reviewer. In this role, I reviewed clinical data carefully and thoroughly in order to come to conclusions about drug efficacy and safety. I reviewed Investigational New Drug Applications (INDs), New Drug Applications (NDAs) and supplemental NDAs (sNDAs) during those three years, including clinical development programs, protocol designs, and trial results. I was the primary reviewer for dozens of IND submissions, and approximately five NDAs. I presented at Advisory panel meetings on behalf of the Agency. I was fortunate to be selected to participate in a new medical officer leadership program at the Center for Drug Evaluation and Research (one of approximately 20 participants). I received several FDA awards, including a high-level FDA award in 1998, the Department of Health and Human Services Secretary's Award (given by Donna Shalala, Secretary of the Department of Health and Human Services) for work I had completed as a medical officer.

In 1997, I was promoted to Deputy Director of the Division of Reproductive and Urologic Drug Products (DRUDP). I remained in this position through 2000. This



EXHIBIT
A

position is essentially "second in command" of a review division, serving under the director and sometimes in place of the director. As a Deputy Director, I participated in final decisions such as whether to place a study on hold or whether to approve/not approve a drug, and whether to update/change labeling for a drug. I also helped address drug safety concerns, including those that arose in the post-marketing setting. I had experience in dealing with drug safety issues as both a team member and a team leader, and as just one of many examples, I chaired FDA's internal safety working group for Viagra. Safety issues were managed with labeling updates and other risk management considerations, and involved a comprehensive multidisciplinary FDA team approach including collaboration with the sponsor.

In 2000, I became the Deputy Director (same role) in the Division of Pulmonary and Allergy Drug Products where I remained until 2003. While in this role, I was also Acting Director for approximately two months. Similar to my role in DRUDP, I was an integral member of teams that would address many issues, including safety concerns. In total, I have had nine years of FDA experience in three different review divisions. I was centrally involved in or the primary decision maker for key regulatory challenges such as IND holds, NDA approval/non-approvals, labeling (which was a key focus of the job), and major protocol design issues. I managed premarketing and post-marketing drug safety concerns either as the head of a team or part of a team within FDA. I managed labeling negotiations for approved products and for addressing safety issues. I presented at several advisory panels on behalf of FDA, and I taught FDA clinical reviewers how to present at Advisory Panel meetings.

In 2003, I left the Agency to become branch chief of the respiratory disease branch at the National Institutes of Health (NIH). As branch chief, I was in charge of creating a cohesive and directed research program for a set of respiratory diseases, including SARS and avian influenza. While at NIH, I was involved in drug development and filed several INDs (as a sponsor) to FDA to pursue NIH-funded research. This experience included working with FDA, enrolling subjects into clinical trials, meeting with investigators, and managing the many additional issues that arise when performing clinical investigations.

In 2004, after more than a decade of work for the federal government, I became an independent consultant. In the past eight years, I have worked with numerous pharmaceutical companies to facilitate the safe and effective development of drugs and to address post-marketing drug safety issues.

Within the preceding eight years as a consultant, I have also worked as a testifying expert. I gave deposition testimony in the Seroquel litigation on January 22 and 23, 2009 (Hopkins v. AstraZeneca, Superior Court of Delaware, New Castle County) in Philadelphia, PA. I also gave deposition testimony regarding Seroquel on November 24, 2009 (Tate, Baker and Marshall v. AstraZeneca, Superior Court of New Jersey, Middlesex County) in Washington, D.C. I have also given deposition testimony in Unimed Pharmaceuticals, Inc. and Laboratories Besins Iscovesco v. Paddock Laboratories and Watson Pharmaceuticals, Inc., Cases Nos 1:03-CV-2501 and 2503 (TWT) (N.D. Ga.). I gave a deposition in Washington D.C. in the Reglan litigation on February 13, 2013 in Gardley-Starks v. Pfizer, U.S. District Court, Northern District of Mississippi. I have never given trial testimony. I am being compensated to serve as an expert witness in this matter at an hourly rate of $600.00.

## MATERIALS REVIEWED

In preparing this report, I reviewed many items, including labels, NDAs, Annual Reports, Periodic Reports, depositions, published literature and regulatory correspondence. A list of the items I reviewed is attached as Appendix B. I may review additional materials as they become relevant and/or available.

## SUMMARY OF OPINIONS

Based on my qualifications, experience and review of materials, it is my opinion that:

1. Reglan is an anti-emetic drug used in the treatment of digestive disorders such as diabetic gastroparesis and gastroesophageal reflux (GERD). The Reglan label adequately, truthfully and accurately described the benefits and risks of the drug. In particular, the label adequately, truthfully and accurately warned doctors about the risk of tardive dyskinesia from long-term use. Since 1985, for over 25 years, the Reglan label has contained a detailed and comprehensive warning regarding the risk of tardive dyskinesia, which states, among other things, that the risk of tardive dyskinesia increases with duration of use and total cumulative dose, that this risk is highest among elderly women, that tardive dyskinesia may be irreversible and that the drug may mask the symptoms. I disagree with any suggestion that the warning was in any way deficient for failing to include specific incidences for specific cohorts. The Reglan label also clearly explained that Reglan

3

was indicated for short-term (4 to 12 weeks) treatment of symptomatic GERD for patients who fail to respond to conventional therapy, and stated that therapy beyond 12 weeks could not be recommended as that was the longest duration of controlled clinical trials. Furthermore, contrary to Dr. Parisian's assertions, the initial Reglan label approved by FDA and subsequent Reglan labels have appropriately and adequately addressed restlessness.

2. When FDA approves a drug's label, that is a determination by the Agency that the information in the label adequately describes the benefits and risks of the drug and that the label is truthful, accurate and not misleading. FDA first approved Reglan over 30 years ago, and has since reviewed the Reglan label on multiple occasions. Each of those reviews and approvals is a determination by the Agency of the safety and efficacy of the drug for its intended use, as well as of the adequacy, truth and accuracy of the Reglan label. In particular, there is on-going scientific support for the statements in the label regarding extrapyramidal symptoms (EPS) and tardive dyskinesia. In reviewing and approving the Reglan label over the years, FDA evaluated the key relevant sources of information, including annual reports, adverse event reports, and relevant scientific literature. FDA was well-aware of the association between tardive dyskinesia and metoclopramide, and the long-term (i.e., off-label) use of metoclopramide. The Reglan label appropriately changed over time as information and knowledge evolved.

3. FDA has carefully regulated metoclopramide for over 40 years. Even prior to approval and use in the U.S., Reglan was used in Europe for several years, having first been approved in France in 1964. FDA was aware of the risk of EPS even before Robins filed its Reglan IND in 1973. From the beginning and throughout the development process, the Agency and Robins discussed the risk of EPS. As noted by FDA, the clinical trials supporting the NDAs appropriately and adequately addressed EPS. In addition, the Agency thoroughly reviewed the early NDAs submitted by Robins for Reglan, which included supportive efficacy and safety information, including comprehensive discussion and data regarding EPS. Moreover, throughout the drug development process and post-approval marketing, sponsors submitted updates on tardive dyskinesia and EPS to the FDA, including spontaneous adverse event reports, periodic safety updates and the emerging medical literature.

4. The labels first approved by FDA as a result of the early NDAs adequately addressed and accurately reflected the risk of EPS. As more information

4

about EPS and tardive dyskinesia, in particular, became known, the label was appropriately updated to reflect that new information. In 1985, based on evolving data, FDA required that Robins add a detailed and comprehensive tardive dyskinesia warning to the label. Robins complied with FDA's request, and a warning about tardive dyskinesia has been in the label ever since. Robins acted appropriately and complied with its regulatory obligations during the application process, post-marketing safety surveillance and labeling of Reglan.

5. During the time that Wyeth held the NDA for Reglan, it also acted appropriately and complied with its regulatory obligations to monitor the safety of Reglan and maintain the label. It submitted periodic adverse drug experience reports, 15-day reports, annual reports and safety updates to FDA. The label continued to adequately and truthfully convey the benefit/risk information for Reglan, including the extensive tardive dyskinesia warning. None of the literature cited by plaintiffs' experts Drs. Parisian and Seeman changed that determination. In addition, Wyeth appropriately responded to FDA's request to add a geriatric use section to the label. The geriatric section did not add any new information regarding the risk of EPS or tardive dyskinesia that was not already in the label.

6. The long-term study that plaintiffs' expert Dr. Parisian suggests should have been done for purposes of attempting to more specifically quantify the risk of tardive dyskinesia would not have been appropriate or approved. Long-term studies to assess drug related risk would generally include a placebo arm or an active comparator arm, and neither of these are tenable for a long-term Reglan study. Additionally, studies describing patients treated long-term with metoclopramide have also been published. While the exact risk attributable to metoclopramide remains unknown, scientific evidence from these studies shows that the risk of tardive dyskinesia is rare, as was concluded by an FDA medical officer in his own review of metoclopramide. The lack of specific quantification of the precise level of risk of tardive dyskinesia attributable to Reglan does not make the label inadequate, false or misleading. Finally, FDA was aware and understood how doctors were prescribing metoclopramide for long-term (i.e., off-label) use, but FDA did not require further study on the issue, and Robins's and Wyeth's approach to pharmacovigilance and labeling was appropriate.

7. In December 2001, Wyeth divested the Reglan tablet NDA to Schwarz Pharma. Because Wyeth was no longer the NDA holder, it no longer had regulatory responsibility for the product and could not revise the product's

5

label.  In addition, ESI Lederle stopped distributing its generic metoclopramide tablet in 2001.

8.  The 2009 boxed warning was based on new information not available to Robins or Wyeth when either held the NDAs for Reglan.  The boxed warning restated the same basic information that was in the earlier label.  The current label as a whole still contains essentially the same information regarding the risk of EPS and tardive dyskinesia, including the tardive dyskinesia warning and the risk of acute dystonic reactions as occurring in approximately 1 in 500 patients.

9.  I disagree with any suggestion that Reglan was "unreasonably dangerous," should not have been approved for GERD or should have been withdrawn for this indication.  This suggestion is contrary to FDA's repeated approvals of Reglan NDAs and sNDAs where the Agency concluded that the drug was safe and effective and that the label adequately conveyed the benefits and risks.  Indeed, despite intense scrutiny of the drug by FDA and the addition of a boxed warning, FDA has never removed the drug from the market, and it remains on the market today.  The boxed warning itself allows for treatment beyond 12 weeks in rare cases where the benefits are thought to outweigh the risk for tardive dyskinesia.  I disagree with Dr. Parisian's suggestions that "Consumer Medical Information" (CMI) is generated or distributed by drug manufacturers, and that Wyeth or Robins should have generated a CMI or undertaken a "Risk Management Strategy."

I have reviewed the reports of plaintiffs' experts Drs. Parisian and Seeman and disagree with their opinions, as discussed above and in more detail below.  I note in general that Dr. Parisian cites many FDA regulations and guidances that, based on my experience at FDA and with the regulations and guidances, do not support her assertions.  Dr. Parisian's report is also extremely broad and contains allegations regarding many topics that are not pertinent to the issues at hand, and my report does not attempt to set forth every single disagreement that I have with her views.  Rather, this report is meant to focus on the relevant issues pertaining to the use of Reglan, including long-term use (beyond 12 weeks) and tardive dyskinesia.  I reserve my right to supplement this report as needed, particularly if the court deems some of the extraneous topics relevant.

6

## BACKGROUND:  FDA AND DRUG DEVELOPMENT

<u>FDA</u>

FDA is composed of a team of approximately 11,500 public health employees who ensure that our foods, drugs, cosmetics, medical devices, and blood supply are safe.[1] The Center for Drug Evaluation and Research (CDER) is the largest Center within FDA, employing nearly 3,000 individuals, and its job is to evaluate drugs fully, to determine for each drug whether its benefits outweigh its risk, and to approve the drug with appropriate labeling.

Within CDER, the Office of New Drugs (OND) is responsible for the primary review and evaluation of new drug products.  There are approximately 15 primary drug review divisions within CDER, each with different areas of expertise.  A drug review division is the central unit responsible for assessing the safety and efficacy of drugs.  Drug review divisions are structured under Offices within FDA (approximately five), and these exist within the Center for Drugs under the Office of New Drugs.

A typical CDER review division includes approximately 30-50 scientists from a variety of backgrounds who interact with each other to fully understand a drug from many perspectives.  These scientists include chemists, animal toxicologists, biopharmacists, pharmacists, statisticians and clinicians.  Most of the staff have a doctorate degree.  Each discipline is responsible for reviewing data specific to their area of expertise.  Chemists, for instance, review how the product is made and its quality, while toxicologists focus on animal studies.  Cross-disciplinary communication is common.  FDA is truly a multidisciplinary team of highly trained professionals.

Within each CDER discipline (clinical, chemistry, etc.), there is a layered structure of primary reviewers and team leaders and those with higher levels of oversight. For example, in my time in the Pulmonary Division, there were approximately 10 medical officers who were supported and led by two team leaders, who were led by the Deputy Director and Director.  Each discipline within a review division is similarly structured, and no single individual reviews data without oversight and a team approach.  The teams come to final decisions after obtaining input from each team member.  The final decisions are generally made by the Division Director, who also has the opportunity to gain insights from higher level CDER authorities

---

[1] http://www.fda.gov/AboutFDA/Transparency/Basics/ucm213161.htm

(Office or Center level). Certain applications, such as new chemical entities, are signed off at the Office level, so the level of signatory authority varies depending on the type of drug application.

Two key partners to the Office of New Drugs are the currently named Office of Surveillance and Epidemiology (OSE) and the Drug Safety Oversight Board. In the past, these offices have been known by other names. Regardless of their names, these reviewers address issues related to drug safety which arise either pre-approval or post-approval. Importantly, both sets of staff (the primary OND review division staff and the safety staff) review drug safety in a comprehensive and collaborative way. The review divisions evaluate the controlled clinical data for a drug, and create labeling for the drug, but they work in collaboration with the drug safety divisions to address concerns, requesting consultative input as needed. The safety staff respond with a review of available data for the adverse event of interest as it relates to the drug (and the drug class), evaluating the post-marketing drug safety reports filed to MedWatch and the literature. They summarize their findings and make suggestions as to how to best address the risk, possibly suggesting labeling changes that the review division then considers. The drug safety staff may also work with sponsors to design additional (epidemiologic or controlled) studies to better elucidate safety findings.

The IND Phase of Drug Development

FDA oversight of the investigation, approval, marketing and safety of prescription drugs in the U.S. starts from the very beginning of the drug development process. FDA begins reviewing a drug under an IND. An IND is typically filed by a drug sponsor to begin human studies with a drug in the U.S., and the application includes scientific information already known about the drug at the time, such as animal toxicology and pharmacology data, and foreign clinical trial data if it exists. The IND sets forth the investigational plan for the drug and includes the initial clinical trial protocols, which set forth how a study is designed and will proceed. When FDA receives an IND, it reviews the data and investigational plan and decides whether to allow the human clinical trials to proceed. FDA also may provide input into clinical trial designs. Sponsors submit to FDA an Investigator's Brochure, the document provided to doctors conducting the studies and which sets forth the known safety and efficacy information about the drug, and FDA monitors safety by reviewing reports of adverse events (AEs) and other safety information generated during clinical trials.

Throughout the IND process, there is continual communication between FDA and the sponsor, including correspondence, submissions and meetings. Key meetings include pre-IND meetings, end-of-phase 2 meetings, and pre-NDA meetings. Prior to any NDA submission, meetings are held with the Agency to ensure that the correct studies have been performed to support efficacy and safety adequately. During this process, FDA benefits from its knowledge about other products in the same class, or other products being developed for the same indication. In sum, FDA is very involved in the drug development process from the beginning.

<u>The NDA Phase of Drug Development</u>

Once the sponsor has completed its clinical studies, an NDA may be submitted to FDA for review and consideration of approval to market the drug in the U.S. for a specific indication. The NDA includes a comprehensive set of data compiled on the drug to date supporting the approval of the drug as safe and effective for its intended use. It includes clinical, toxicology, pharmacology, pharmacokinetic, chemistry, manufacturing and other data. Key components of an NDA include the summary of efficacy data section, summary of safety data section, and the proposed label. Sponsors must follow FDA guidances and regulations when submitting their NDA so that the data are presented in a clear and structured format.

Once FDA has accepted an NDA for filing, FDA has ten months to review a typical NDA and six months to review a priority NDA. These timelines have been in place over the past decade, approximately, but were not in place during the initial approval timeframes of Reglan when reviews were conducted over a longer period of time. FDA reviews the data summaries provided by the sponsor, but they also perform their own independent analyses of the primary data sets. An NDA review team is again multidisciplinary (chemistry, statistics, clinical, toxicology, manufacturing, pharmacology, etc.), and again layered (primary reviewers, team leaders, directors/deputies). For example, various sections of an NDA are reviewed not only by the team of clinicians, but also by other disciplines such as statisticians. Reviews are also performed by multiple staff within each discipline so there is very significant oversight in this process. If issues arise regarding either safety or efficacy results, FDA may convene an Advisory Committee to provide advice on decisions relating to efficacy, safety and labeling of the drug.

During the NDA review process, the reviewer may uncover significant efficacy or safety concerns which can lead FDA to ask the sponsor for more data (either additional analyses or any additional clinical trial data) to support the application.

FDA also has all datasets for the drug in house, and will evaluate them independently. As in the IND process, during the NDA process, FDA benefits from its knowledge about other products in the same class, or other products being developed for the same indication. Ultimately, FDA will only approve a drug once its efficacy and safety have been adequately addressed, and a favorable risk/benefit profile is supported.

Following review of the NDA, FDA renders their decision. Until 2008, FDA could respond to the sponsor in one of three ways: non-approval, approvable, or approval. A non-approval meant that the data submitted did not support the drug's use for the desired indication. An approvable decision meant that the submitted data may support the drug's use for the desired indication, but there were remaining concerns that need to be addressed. FDA outlined the deficiencies in the data and clarified what further work should be done. The drug could only be approved once work was completed and the results were reviewed favorably by FDA. Since 2008, FDA no longer issues "approvable" or "non-approval" letters, and has replaced those letters with a "complete response" letter when communicating a decision to a drug company that its NDA will not be approved in its present form. The criteria for when FDA must refuse to approve an NDA are laid out in the regulations (21 CFR 314.125). For instance, FDA will reject an NDA if the studies the sponsor relied upon in the NDA were inadequate. An approval means FDA has found the drug safe and effective for the desired indication. For an approval decision, FDA must also determine that the package insert (or label) is truthful and accurate, and that it is not false or misleading.

Labeling is very important to FDA. The label reflects the key risks and benefits of a drug in a concise fashion, but is not meant to be a comprehensive review of the drug. The purpose of the label is to provide to prescribers scientific information necessary for the safe and effective use of the drug. As per 21 CFR 201.56, "the labeling must contain a summary of the essential scientific information needed for the safe and effective use of the drug." FDA regulations also mandate what types of information the label must contain (e.g, Indications and Usage, Dosage and Administration, Warnings, Precautions, Adverse Reactions, etc.). (21 CFR 201.57, 201.80). While drafting and updating of the label can stem from discussions and dialogue between a sponsor and FDA, at the end of the day FDA has ultimate authority to approve or not approve the label.

Labels focus on the indicated population and the risk/benefit profile of the drug as established in that population for the approved dose/regimen. Off-label use of a product is rarely mentioned in labeling. One reason for this is that FDA does not

want to endorse off-label use and/or allow off-label promotion of the product. Even describing safety data related to a product's off-label use can sometimes be considered an implicit endorsement of the product's off-label use. The Agency is careful about adding information into labels regarding off-label indications. Safety data are always critically reviewed. Unfortunately, for off-label indications, the safety data may derive from case reports or small published studies, with data that are not of the same quality as data in an NDA. Nonetheless, these are carefully reviewed and if the data support a new and important safety concern, even in an unlabeled population, FDA will update the label accordingly.

The first draft of the label is often written by the sponsor and is submitted to FDA with the NDA submission. Towards the end of the review process, FDA then works on revisions to that label, and multiple iterations generally follow during FDA's review cycle. FDA has the final say as to the exact wording of the approved labeling, with which the sponsor must agree or the product will not be approved. FDA considers whether the proposed labeling is truthful, accurate and appropriate. FDA will not approve a drug unless they concur with the accuracy and truthfulness of the information provided in the label, including safety information regarding risks as set forth in the Warnings, Precautions, Adverse Reactions and other relevant sections of the label. (21 CFR 314.125; 21 CFR 201.56).

Once a sponsor has obtained initial approval for its drug, it can seek to obtain additional approvals by filing a supplemental application, or sNDA, with data supporting additional indications. FDA's process and depth of review for sNDAs are the same as for original NDAs. As with an NDA, in order for the sNDA to be approved, the sponsor must follow the exact wording of the final label as approved by FDA. Again, FDA will not approve the drug unless the final label is acceptable to FDA. As with approval of the original NDA, an approval of an sNDA means that FDA has found the drug safe and effective and that the label adequately conveys the benefits and risks, and the statements in the label are truthful, accurate and not misleading.

Finally, an Abbreviated New Drug Application (ANDA) holder's labeling must be the same as the labeling approved for the Reference Listed Drug, which is the reference standard for conducting bioequivalence testing. (21 CFR 314.94). FDA may withdraw approval of an ANDA-approved drug if its label is no longer consistent with that for the Reference Listed Drug. (21 CFR 314.150).

## The Post-Approval Phase of Drug Development

After a drug is approved and reaches the market, both the NDA sponsor and FDA are required to ensure its ongoing safety. In accordance with FDA regulations, sponsors must collect, analyze and report to FDA AEs reported in association with the drug, from marketing experience, postmarketing clinical investigations, postmarketing epidemiological/surveillance studies, reports in the scientific literature, and unpublished scientific papers. (21 CFR 314.80). Serious and unexpected adverse events which occur in association with a drug must be reported to FDA on an expedited basis, within 15 days of receipt.

The regulations also describe other postmarketing safety reporting requirements, including periodic adverse drug experience reports for AEs not reported as 15-day reports. (21 CFR 314.80). Additionally, sponsors are required to submit NDA annual reports to FDA. (21 CFR 314.81). Among other thing, an annual report includes a summary of significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug. It also includes a list of published literature and the current labeling for the drug.

FDA reviews all AEs that it receives directly and those it receives from the sponsor. AE reports are followed within FDA by both the primary medical officer responsible for the drug as well as by the drug safety evaluator. Communication between these staff is common, and requests for evaluations of AE reports may be made periodically by the primary reviewer specific to a particular safety concern that may be evolving, or the vice versa may occur if the drug safety evaluator notes a finding of concern. The sponsor and FDA carefully review all safety findings in the context of the existing label to assess if any new action is required to convey important safety findings.

FDA maintains AERS, the Adverse Event Reporting System database, which contains all reports of AEs for each drug and can be used to conduct analyses. FDA reviews and analyzes literature, both on its own and what is reported by the sponsor. FDA also reviews annual reports and period adverse drug experience reports, which outline the evolving safety findings with a drug.

If a safety concern arises for a drug (either pre-approval or post-approval), FDA assesses the safety finding and the label for adequacy. Should additional analyses and reports be required, FDA will request these of the sponsor. FDA addresses a safety concern not only for a single agent, but also as it relates to other products which may work via similar mechanisms. This requires the drug review division

to be comprehensive and review the available data for the related products (both premarket and postmarket), and then render a fair decision for each product regarding labeling changes, safety announcements or other regulatory actions. Although drugs that have similar pharmacologic activity can sometimes have similar adverse effects, this is not always the case. While safety information in these circumstances may be included on all labels in the same way, labeling can also be drug specific.

FDA also can obtain outside expert input by convening Advisory Committees to address particular issues, including a safety concern. The panel includes experts who provide advice and input to FDA. Members vary depending on FDA's needs and may include, for example, clinicians, toxicology experts and statisticians. Packages are prepared for these experts by both the sponsor and FDA in advance of the meeting. At the meeting, both FDA and the sponsor typically present their findings to the committee, and there is also an open public hearing. A list of questions is usually provided to guide the panel's discussion and at the end of the meeting, the panel answers those questions.

Advisory Committees provide a way for FDA to seek outside expert input in a public forum. While Advisory Committees provide important perspective and input, FDA makes the final regulatory decisions. Thus, while FDA works rapidly to address drug safety issues, they do so in a comprehensive and thoughtful way so that the ultimate information conveyed in the label is as accurate as possible.

At all times, FDA is cognizant that safety information related to any product should be conveyed truthfully, accurately and concisely. Careful attention to every word in the label is a normative practice at the Agency. The label is updated as new information comes to light based on more extensive use of the drug after it reaches the market. The label is a key work product that continually undergoes review and revision, particularly regarding safety, as needed.

Changes to labeling may be initiated by the sponsor, subject to FDA review, but changes are sometimes initiated by FDA. In my experience, the sponsor usually first consults with FDA before initiating a label change regarding any significant drug safety concern. Among other things, FDA and the sponsor consider how a potential label change might affect a prescriber's understanding and use of the drug. Any change in the label constitutes a supplement to the NDA and, therefore, must ultimately be revised and approved by FDA. If the sponsor initiates the label change, they must submit a supplemental application fully explaining the basis for the change.

13

FDA permits two types of labeling supplements: (1) prior approval supplements, which require FDA review and approval before a change is made; and (2) "Changes being Effected," or CBE, which may be implemented prior to FDA approval, but after FDA notification. In my experience at FDA, the CBE route was used to make minor editorial changes to a label, or possibly to add new findings related to drug safety in the Post-Marketing Experience section of the label. Any significant new labeling change relying on substantial new data, including those related to drug safety, was submitted as a prior approval supplement, allowing FDA time for review and input. Even if a sponsor adds new risk information via a CBE, FDA must review and approve these submissions and may later deny approval of the CBE supplement. An FDA guidance document regarding CBE supplements and their implementation advises that the Agency welcomes discussions with sponsors before they submit a CBE supplement. In my experience, both at FDA and since leaving FDA and working as a consultant, I have never seen the CBE route used to include a new warning for a drug, either boxed or unboxed. Finally, substantial safety changes to labeling may be communicated by sponsors through a Dear Health Care Professional letter (sometimes referred to as a Dear Doctor letter), but in my experience a sponsor will first consult with FDA before sending such a letter.

FDA continually takes the opportunity with each supplemental application or CBE to review the overall label carefully in order to make changes whenever it is deemed necessary. In addition, FDA conducts a regular review of the labels of approved and marketed drugs. For older products like Reglan, FDA reviews the label at least annually when NDA annual reports and periodic adverse drug experience reports are filed. If a sponsor with an approved product does not agree to an FDA mandated label change, that product can be deemed misbranded and, if necessary, removed from the market. This has always been true, even with passage of the 2007 Food and Drug Administration Amendments Act which allowed FDA to more directly implement safety labeling changes. In my nine years of experience as a medical officer at FDA with many products and many labels, FDA has had to be comfortable with their accuracy and truth, or, in the rare case where the applicant would not submit the required label change, they would take regulatory action with the Office of Compliance to consider the product misbranded.

The regulation for adding a warning to the label for older products like Reglan states: "The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal

relationship need not have been proved." (21 CFR 201.80(e)).  AE reports showing close proximity in time between the uses of the drug and the AEs do not necessarily mean that this standard has been met to change the label to add a warning.

Off-label use of a drug is the use of a drug in a manner that is not described and approved in labeling.  It can involve, for instance, a different dose of drug, a different patient population, or a different duration of use.  Off-label use of drugs is common and is an important aspect of medical practice.  FDA does not regulate the practice of medicine and in fact recognizes off-label use as reasonable: "Good medical practice and the best interests of the patient require that physicians use legally available drugs, biologics and devices according to their best knowledge and judgment."[2]  Importantly, safety reports as well as literature reports related to a drug are submitted to the Agency regardless of whether the drug was used on label or off-label.  Labeling will address off-label safety concerns with a drug, if FDA finds this necessary.

To summarize, FDA's mission is to ensure that the drugs made available to the American public are safe and effective as labeled.  The Agency is integrally involved with drug development, and safety is carefully considered both pre-approval and post-approval.  When safety concerns arise, the Agency works carefully to determine that labels contain accurate and appropriate information.

---

[2] www.fda.gov/RegulatoryInformation/Guidances/ucm126486.htm

15

## REGLAN OVERVIEW

It is my understanding that plaintiff Robert Cooper alleges he ingested metoclopramide between 1998-2009 for the treatment of GERD, and claims that as a result he now has tardive dyskinesia.

Metoclopramide is a prescription drug marketed in the U.S. under multiple NDAs and Abbreviated New Drug Applications. Metoclopramide has been used since the 1960s in Europe. It has been regulated in the U.S. by FDA for over 40 years, even before Robins filed its Reglan IND in 1973.

Metoclopramide is an anti-emetic drug used in the treatment of digestive disorders such as diabetic gastroparesis and GERD. The drug works to reduce nausea and vomiting as well as to improve gut motility through its effects on the central nervous system (CNS) at various receptors (dopamine 2 receptors, 5-$HT_3$ and 5-$HT_4$ receptors). Metoclopramide is not used or approved for the treatment of psychiatric disorders.

Reglan has been approved for four formulations (injectable, tablet, syrup and Orally Disintegrating Tablet) and for six indications. Each Reglan approval was obtained through the NDA or sNDA process and each time FDA determined that Reglan is safe and effective and that its benefits outweigh its risks for the indicated uses. As part of its approval decisions, FDA determined on each occasion that the Reglan label was truthful, accurate and not misleading. Reglan is approved for a number of short-term indications (including single use). Some of the Reglan approvals during the Robins sponsorship include:

- 1979: injectable formulation for small bowel intubation and radiological examination

- 1980: tablet formulation for the relief of symptoms associated with diabetic gastroparesis

- 1982: use of Reglan for the prevention of nausea and vomiting following chemotherapy

- 1983: syrup formulation

- 1984: symptomatic GERD for patients who fail to respond to conventional therapy

16

- 1985: label is updated with an extensive and detailed warning regarding the risk of tardive dyskinesia and a comprehensive revision to the Adverse Reactions section, including a detailed discussion of the four types of EPS

- 1987: prevention of post-operative nausea and vomiting

During this same timeframe, there were multiple additional labeling supplements filed for Reglan and reviewed by FDA, including several that were CBEs. This was a product, therefore, that was intensively under review. Each time FDA approved the product, they were approving the label, which had to convey accurate and truthful risk information. In addition, FDA reviewed the truth and accuracy of the label on an annual basis when reviewing the Reglan annual reports submitted by Robins and later Wyeth.

Reglan is the only FDA approved therapy for diabetic gastroparesis, a condition for which there is very poor gut motility. It is also the only approved therapy known to improve gut motility in patients with GERD, a condition that results in stomach contents, including acid, to back up into the esophagus. Other agents that promote gut motility have proven to have serious cardiac side effects, and have either failed to gain approval or been removed from the market. Thus, Reglan serves a unique and important role in the management of patients who have slow gastrointestinal (GI) transit. In both diabetic gastroparesis and GERD, symptoms of nausea, vomiting, abdominal fullness, bloating and heartburn can be debilitating and profoundly disturbing to patients who are severely affected. Reglan has been evaluated for diabetic gastroparesis as well as GERD and has proven to provide meaningful clinical benefit for these conditions. Notably, both indications were considered and received a favorable vote by outside FDA Advisory Panels prior to their FDA approval.

Since its original approval for GERD, Reglan has been indicated for the short-term treatment of GERD (4 to 12 weeks) for patients who fail to respond to conventional therapy. Thus, Reglan is an agent reserved to treat the more recalcitrant GERD cases that do not respond to traditional treatment options such as avoiding large meals, eating a low fat-diet, elevating the head of the bed, and treating with acid-blocking therapy. All medical decisions to treat more chronically with Reglan need to be made by the healthcare provider and the patient, with an appreciation of the benefits of the drug in that particular patient, and an understanding of Reglan's risks. In my opinion, the label for Reglan has been very clear regarding the approved duration of use. The 12-week limitation

17

for GERD reflects the fact that the controlled clinical trials that supported FDA's approval were 12 weeks maximum duration. Nonetheless, some patients with GERD may prove very challenging to manage, and if Reglan is beneficial, physicians may opt to prescribe Reglan off-label for long-term use—that is, beyond 12 weeks. In my opinion, this approach is reasonable, as it allows for each provider to make the appropriate risk/benefit decision.

The Reglan label has adequately, truthfully and accurately warned about EPS and tardive dyskinesia for over 25 years. EPS include all of these symptoms: dystonia, akathisia, parkinsonism and tardive dyskinesia. With respect to tardive dyskinesia (which is one type of EPS), the word tardive means the slow or belated onset of the syndrome and the word dyskinesia conveys involuntary repetitive body movements. This syndrome is generally recognized following long-term use of antipsychotic drugs and is also associated with the long-term use of metoclopramide. The movements can include grimacing, tongue protrusion, lip smacking and rapid eye blinking, or they may involve the limbs and torso. Tardive dyskinesia can be irreversible.

Based on my review of the regulatory record, including the NDAs, Annual Reports, adverse reaction reports, labels and correspondence between the sponsors and FDA, Robins and Wyeth complied with their regulatory obligations including during drug development, approval, post-marketing pharmacovigilance (including submissions of AE reports and literature report references to FDA) and labeling.

## REGLAN (1973 - Late 1989) (ROBINS)

### 1973 IND Filing and 1979 Approval for Reglan Injectable

Robins filed an IND with FDA on February 2, 1973 describing what was already known about metoclopramide and setting forth the U.S. investigational plan. The regulatory history preceded this filing by at least ten years, including literature and clinical trials and extensive use outside the U.S. from 1964 onward.

At the time of the IND filing, FDA was aware of EPS as adverse effects that could be associated with metoclopramide. These symptoms could manifest as acute dystonic reactions (primarily), including involuntary movements of the limbs, facial grimacing, torticollis, oculogyric crisis, protrusions of the tongue, and even rare reactions that resembled tetanus or resulted in stridor and dyspnea. These reactions were reversible with the cessation of drug and could be managed acutely

by giving a Benadryl injection. The regulatory record reflects extensive discussions between FDA and Robins about EPS, including monitoring for EPS during clinical trials. FDA reviewed and gave input into Robins's clinical trial protocols, and evaluated safety findings from their clinical trials. The Investigational Brochures for IND clinical trials discussed and warned clinical trial investigators about potential EPS. EPS side effects were well appreciated as a side effect of Reglan and were captured in a clinically meaningful way during the clinical trials. Moreover, it is not correct to automatically consider adverse events reported as restlessness by clinical trial investigators to be akathisia or EPS.

In 1976, Robins filed an NDA seeking approval of both a tablet and injectable formulation. Although the NDA was split and FDA focused its initial review on the injectable, the submission included data supporting both tablet and injectable formulations. In this submission, EPS was discussed extensively. For example, the clinical safety summary section highlighted as a key safety concern reports of extrapyramidal disorders. Four major sources of clinical safety data were provided that focused on EPS: the Committee on Safety of Medicines (later published in Bateman (1985)), a chart provided to Robins by Delagrange, 71 published papers relating to the indications included in the NDA, and Robins clinical trial experience. The NDA also included an extensive list of references about clinical safety, including studies regarding EPS (Bodi (1966), Derbanne (1967), Robinson (1973)) and a comparative study of metoclopramide and procholorperanzine conducted by Delagrange, which provided support for statements in the label.

EPS was also addressed in the proposed label included in the NDA. FDA made edits to the proposed label, including the discussion of EPS, before approval. Consistent with the NDA data, the approved label accurately described acute EPS events as occurring in approximately 1 in 500 patients dosed with Reglan, an estimate which remains in the label today.

Two advisory panels, one in 1976 and one in 1978, met to discuss the risk/benefit profile of Reglan. The 1978 panel agreed to the approval of Reglan injectable for its short-term indications and in 1979, FDA approved Reglan for these uses. Reglan injectable was approved by FDA in 1979 for two short-term use indications to facilitate placement of feeding tubes or to help with radiologic procedures involving the gut.

<u>1980 Approval of Reglan for Diabetic Gastroparesis</u>

In September 1979, Robins filed an amended NDA seeking a diabetic gastroparesis indication for a Reglan tablets formulation. Again, FDA and the sponsor fully appreciated EPS as a potential side effect of Reglan. The 1979 NDA addressed EPS and again provided information regarding EPS reports from the Bodi study and added Porter and Jick (1977).[3] FDA consulted with an Advisory Committee during review of the application, and an October 1979 Advisory Committee meeting was convened. During this meeting, long-term safety was addressed, and it was clear that there was an appreciation of the EPS-related side effects of Reglan as being its most notable adverse effect. On October 25, 1979, at the request of the Advisory Committee, Robins submitted a summary of the safety of metoclopramide and diabetic gastroparesis. In 1980, the NDA for the diabetic gastroparesis indication was approved.

The summary basis of approval (SBA) for the diabetic gastroparesis indication shows that EPS findings were well understood by the Agency as a key safety concern related to Reglan. The SBA identified the central nervous system effects of Reglan and devoted considerable discussion to Reglan's ability to elicit EPS such as tremors and dystonias. The SBA also observed that Reglan's safety was supported by information from 71 published reports, many of long-term use, involving nearly 5,000 patients.

At the time of the 1980 approval of tablets for diabetic gastroparesis, Robins agreed to restrict distribution of Reglan to hospital pharmacies only and to conduct a post-marketing surveillance study to characterize the use of oral Reglan for conditions other than diabetic gastroparesis (e.g., GERD). Robins did not immediately begin distribution of Reglan, however. In 1981, FDA rescinded the distribution restriction requirement. Of note, Reglan had been available ex-U.S. without any such restrictions for approximately a decade. It does not appear that FDA required completion of the post-marketing study. In this same time frame, GERD was being considered as a potential indication by an FDA Advisory Committee in January 1981 and May 1982. At the conclusion of the May 1982 Advisory Committee meeting, there was a unanimous vote in favor of the approval of Reglan for GERD.

---

[3] Porter, J. and Jick, H. Drug-induced anaphylaxis, convulsions, deafness, and extrapyramidal symptoms. *Lancet.* 1977;587-588.

In sum, from the beginning FDA and the sponsor recognized that Reglan was a dopamine antagonist, and that because of this action, it could result in EPS side effects. These EPS side effects were primarily manifested as acute dystonic reactions that had a range of presentations, and that could occur in approximately 1 in 500 treated patients. The approvals of Reglan in 1979 and 1980 were supported with clinical data to demonstrate its benefits, and labeling addressed its safety risks, including the risks of EPS, accurately, appropriately and consistent with the science at the time. FDA's approvals meant that it found the label truthful, accurate and not misleading.

<u>Early Literature Regarding Reglan and the Risk for Tardive Dyskinesia and the 1981 Label Update for "Rare Persistent Dyskinesias"</u>

Initial reports of tardive dyskinesia in association with metoclopramide began with a case report in the British Medical Journal in January of 1978.[4] The patient was a 48-year-old male who had taken metoclopramide for six years, after which he discontinued and subsequently developed symptoms consistent with tardive dyskinesia. At the end of that year, in December of 1978, another report was published.[5] This report described three patients who developed both tardive dyskinesia and Parkinsonism in association with long-term metoclopramide use, but all improved with longer term follow-up. Both reports were brief. In 1981, a Swedish publication described a case of tardive dyskinesia in association with metoclopramide.[6] Also in 1981, a letter from Grimes to the New England Journal of Medicine described seven patients who experienced tardive dyskinesia (five reportedly had both Parkinsonism and tardive dyskinesia) after taking metoclopramide an average of 2.5 years.[7] A 1981 World Health Organization (WHO) memo also described ten cases of tardive dyskinesia, all associated with long-term use of metoclopramide. Notably, there could be some redundancy in each of these reports. However, in the 1978-1981 timeframe, it is fair to say that tardive dyskinesia was becoming recognized as a possible risk associated with the long-term use of Reglan. Additionally, these reports indicated that physicians were prescribing metoclopramide for long-term use. The regulatory record reflects that FDA was aware of and considered these emerging reports of tardive dyskinesia. For instance, Grimes' letter to the New England Journal of Medicine was discussed at the 1982 FDA advisory committee meeting prior to the approval of GERD.

[4] Lavy et al, BMJ 1978;1(6105):77-78
[5] Kataria et al, Lancet 1978; 2(8102):1254-1255
[6] Haagstrom, Lakartidningen 1981;78 (32-33):2751-2752
[7] Grimes NEJM 1981; 505(23):1417

On November 6, 1981, Robins submitted a revised label that expanded the already existing EPS warning to include the finding of "rare persistent dyskinesias" in association with Reglan. This was accepted by FDA and incorporated into the labeling along with more details about EPS symptoms. The term "rare persistent dyskinesias" accurately describes these early brief case reports. As increasing information about EPS and tardive dyskinesia came to light, the label evolved to include a warning for tardive dyskinesia, as discussed in more detail below.

<u>1984 Reglan Approval for GERD</u>

Beginning in 1976, as part of its initial NDA submission, a GERD indication was sought by Robins, but FDA did not approve the application immediately. In January 1981, an Advisory Panel was convened and at that time they considered five placebo-controlled, double-blind studies in support of the efficacy and safety of Reglan for GERD. During the January 1981 Advisory Committee meeting, efficacy and safety were discussed. In May 1981, Robins filed an sNDA seeking approval of Reglan tablets "as a short-term (4 to 12 weeks) adjunct for patients with symptomatic gastroesophagael reflux who fail to respond to conventional therapy." In addition to the five trials originally discussed during the January 1981 Advisory Committee, the submission included a sixth study for the GERD indication.

On May 13, 1982, a second Advisory Panel meeting was convened. During these discussions, it was noted that Reglan was associated with EPS side effects and that literature was emerging regarding cases of tardive dyskinesia in association with its long-term use. It was also noted that there were four literature citations encompassing nine cases of tardive dyskinesia in association with metoclopramide. The sponsor also discussed its compassionate use, open-label trial involving a large number of patients treated longer term with Reglan, to better assess its long-term safety in those patients who might require it long term. FDA and the panel were therefore well aware of the potential for the long-term use of Reglan and its known EPS side effects, including its potential to cause tardive dyskinesia. Duration of use was also discussed extensively. The Advisory Panel voted unanimously in favor of the approval of Reglan for GERD, with a recommended duration of use up to 12 weeks based on pivotal trials. FDA was to make the final determination as to the indicated time period. FDA approval for short-term (4 to 12 weeks) therapy for GERD occurred on August 15, 1984. As reflected in the SBA for GERD, approval was based on Robins-sponsored clinical trials, clinical trials sponsored by other

22

companies, and data including the medical literature, such as Robinson (1973) and Porter and Jick (1977). Also on August 15, 1984, FDA approved the addition of Parkinsonism to the EPS warning.

Just a few months earlier, in January 1984, FDA contacted Robins to inform them that the Neuropharmacologic Advisory Panel was meeting to discuss the neuroleptics and their risks, with the meeting to be held in February 1984. As part of this meeting, the panel discussed EPS side effects (including tardive dyskinesia) of the neuroleptic antipsychotic agents. Metoclopramide was not discussed at this meeting as it is not used to treat psychiatric disorders but the issue of tardive dyskinesia was discussed. Because Reglan is a dopaminergic blocking agent with the potential for tardive dyskinesia as an associated risk, the meeting was relevant to Reglan. At the meeting, it was recognized that a precise estimate for the risk of tardive dyskinesia with the neuroleptics was difficult to ascertain.

In my opinion, it is difficult to pose a precise risk estimate for tardive dyskinesia associated with metoclopramide because this requires very long-term use and even then, the risk may not be high enough to detect unless a very large number of patients are evaluated. Additionally, no comparator arm exists, and a long-term placebo arm (to manage highly symptomatic patients) would be unethical. Moreover, the risk of tardive dyskinesia is low, and doing a study to attempt to ascertain the specific risk attributable to metoclopramide would not meaningfully add to the knowledge of the risk. The definition of tardive dyskinesia can be challenging, because if a highly sensitive instrument were used for subtle neurologic findings, a higher proportion of "tardive dyskinesia cases" could be determined, but the relevance of the findings clinically could be questioned. As concluded in Khot (1991), tardive dyskinesia and spontaneous dyskinesia (unrelated to the drug, which can occur with aging) appear the same, and it cannot be determined whether a patient's abnormal movements were induced by the medication or developed spontaneously. In fact, two studies cited by Dr. Parisian, Ganzini (1993) and Sewell (1994), found in their studies relatively high rates of tardive dyskinesia for patients not exposed to metoclopramide. A retrospective study based on data from medical claims or medical records would be very challenging given the difficulty in determining whether the abnormal movements recorded in the data are actually tardive dyskinesia. Finally, it is also challenging to convey a single risk estimate given that the risk of tardive dyskinesia associated with long-term use of metoclopramide changes with duration of treatment. The lack of a specific estimate of the risk in the label did not make the label inadequate, false or misleading.

23

Neither the literature nor AE reports supports providing a quantification of a specific risk estimate in the label. As discussed below, however, there were some estimates on the risk of tardive dyskinesia associated with longer term metoclopramide use from the literature during this timeframe of the 1980s. These data provide some perspective on the level of risk.

A 1984 article by Wiholm et al. attempted to convey a risk estimate based on 11 reports of tardive dyskinesia that were reported to the Swedish Adverse Drug Reactions Advisory Committee from 1977 through 1981, all in association with metoclopramide.[8] If one took into account total drug sales and prescription statistics, this yielded a rate of approximately one case for every 2,000-2,800 treatment years. The authors admitted that the true incidence of tardive dyskinesia after long-term treatment was not known, noting that a much larger population must be studied before any firm conclusion on the real incidence could be confirmed.

In a long-term Robins study of 1,053 patients treated with Reglan, Protocol 50, in which 53% of the patients received the drug for six consecutive months and 43% received it for at least 12 months, there were no cases of tardive dyskinesia. Of these 1,053 patients, the drug was discontinued due to adverse events that were possibly/probably attributed to Reglan in only 4%. This study was submitted to FDA and described in the label approved by FDA in 1984, as were data from the Bodi study. No adverse effects related to EPS (including no cases of tardive dyskinesia) were observed in the GERD subgroup.

In 1985, Bateman et al.[9] evaluated the epidemiology of EPS side effects of metoclopramide, noting that with an estimated 15.9 million prescriptions in the United Kingdom from 1967-1982, there were 479 reports of EPS side effects. Most of these were reported as dystonias or dyskinesias, 20 were Parkinsonism, and four were tardive dyskinesia. While under-reporting can be acknowledged as a concern, the relatively small proportion of overall EPS reports reported as tardive dyskinesia (4 of 479 or about 1% of all reports) is noteworthy. Overall, these reports support that while tardive dyskinesia can occur with long-term Reglan use, the rate of occurrence is very low. Of note, earlier results from the same source (Committee on Safety of Medicines) were included in the initial NDA, when there were 169 reports of EPS over 10 years of use in the UK.

---

[8] Wilholm et al. BMJ 1984;288:545-547
[9] Bateman et al. BMJ 1985;291:930-932

This is also supported by the conclusions of Dr. Shaffer, an FDA medical officer, in his 2002 abstract and 2004 report on metoclopramide and tardive dyskinesia.[10] In his 2002 evaluation of FDA's AERS database he found 79 reports of tardive dyskinesia in association with Reglan, but in many of these cases, there were confounding uses of neuropsychiatric drugs or pre-existing diseases that could also have contributed to the risk. He concluded that tardive dyskinesia is a rare, serious and potentially irreversible side effect associated with Reglan. A subsequent 2004 paper by Shaffer[11] provided further input on this topic, evaluating now a total of 87 reports of tardive dyskinesia from AERS in association with Reglan. Only 46% of cases (40) met both tardive dyskinesia definition criteria: abnormal involuntary movements and duration of use longer than 30 days. Concomitant drugs and comorbid diseases were again contributing risk factors in many cases. While acknowledging the underreporting of spontaneous reports, Shaffer concluded that tardive dyskinesia was a rare adverse effect of metoclopramide, also noting it was serious and potentially irreversible. His conclusion that tardive dyskinesia was rare was supported by his review of IMS prescription data from 1992-2003.

FDA was carefully evaluating the antipsychotic neuroleptic agents and addressing their labeling for the risks of tardive dyskinesia and other serious side effects in 1984 and 1985. A precise estimate for the risk of tardive dyskinesia could not be determined, was challenging to convey, and was not ultimately included in antipsychotic labeling as no single estimate (or even a range) could be agreed upon. The precise risk of tardive dyskinesia with the use of Reglan similarly could not be established. The Reglan labeling does, however, convey that the risk increases with the duration of exposure to the drug, and that it is more common in the elderly, especially elderly women. For both products (the antipsychotics and Reglan) physicians must make careful risk/benefit decisions regarding their long-term use. I believe the Reglan label of 1985 appropriately informed users of the risks of tardive dyskinesia, and that the information in that Warning (which remains today) continues to be appropriate.

<u>1985 Reglan Labeling Update Regarding Tardive Dyskinesia Risk: Tardive Dyskinesia Warning</u>

In March 1985, FDA informed Robins that a tardive dyskinesia warning should be added to the Reglan label. Three months later, in June 1985, Robins responded that the requested changes were being added to the label and in August 1985, FDA

---

[10] Shaffer et al, Clinical Pharmacology and Therapeutics 2002;Abstract MPI-78; Journal of the American Pharmacist's Association 2004;44(6):661-665

[11] Journal of the American Pharmacist's Association 2004;44(6):661-665

approved these changes.  Notably, the class warning that applied to neuroleptic drugs agents did not apply to metoclopramide, and Reglan's labeling changes were not as extensive as those required for the neuroleptic agents.

Three full and descriptive paragraphs about tardive dyskinesia were added to the Warnings section:

> *Tardive Dyskinesia*:  Tardive dyskinesia, a syndrome consisting of potentially irreversible, involuntary, dyskinetic movements may develop in patients treated with metoclopramide.  Although the prevalence of the syndrome appears to be highest among the elderly, especially elderly women, it is impossible to predict which patients are likely to develop the syndrome.  Both the risk of developing the syndrome and the likelihood that it will become irreversible are believed to increase with the duration of treatment and the total cumulative dose.

> Less commonly the syndrome can develop after relatively brief treatment periods at low doses; in those cases, symptoms appear more likely to be reversible.

> There is no known treatment for established cases of tardive dyskinesia, although the syndrome may remit, partially or completely, within several weeks to months after metoclopramide is withdrawn.  Metoclopramide itself, however may suppress (or partially suppress) the signs of tardive dyskinesia, thereby masking the underlying disease process.  The effect of this symptomatic suppression upon the long-term course of the syndrome is unknown.  Therefore, the use of metoclopramide for the symptomatic control of tardive dyskinesia is not recommended.

The Adverse Reactions section of the label was also updated to include a detailed description of the types of EPS (including tardive dyskinesia) as follows:

> *Extrapyramidal Reactions (EPS)*.  Acute dystonic reactions, the most common type of EPS associated with metoclopramide, occur in approximately 0.2% of patients (1 in 500) treated with 30 to 40 mg of metoclopramide per day.  In cancer chemotherapy patients receiving 1-2 mg/kg per dose, the incidence is 2% in patients over the ages of 30-35, and 25% or higher in children and young adults who have not had prophylactic administration of diphenhydramine.  Symptoms include involuntary movements of limbs, facial grimacing, torticollis, oculogyric crisis, rhythmic protrusion of tongue, bulbar type of speech, trismus, opisthotonous (tetanus-like reactions), and rarely, stridor or dyspnea; ordinarily these symptoms are readily reversed by diphenhydramine (see Warnings).

> Parkinsonian-like symptoms may include bradykinesia, tremor, cogwheel rigidity, mask-like facies (see Warnings).

26

> Tardive dyskinesia most frequently is characterized by involuntary movements of the tongue, face, mouth or jaw, and sometimes by involuntary movements of the trunk and/or extremities (see Warnings).
>
> Motor restlessness (akathisia) may consist of feelings of anxiety, agitation, jitteriness, and insomnia, as well as inability to sit still, pacing or foot-tapping. These symptoms may disappear spontaneously or respond to a reduction in dosage.

The 1985 label update provided truthful, accurate, relevant and key information for prescribers regarding the risk of tardive dyskinesia. The warning informed prescribers that (1) metoclopramide can cause tardive dyskinesia; (2) tardive dyskinesia is potentially irreversible; (3) it is impossible to predict who will develop tardive dyskinesia; (4) the risk increases with age, especially so in women; (5) the risk increases with the duration of treatment and the total cumulative dose; and (6) there is no known treatment for tardive dyskinesia.

The label also continued to indicate that FDA-approved duration of use for GERD is limited to 12 weeks. The "Indications and Usage" section of the label stated that the drug was "indicated as short-term (4 to 12 weeks) therapy for adults with symptomatic, documented gastroesophageal reflux who fail to respond to conventional therapy." In addition, the "Dosage and Administration" section stated: "Therapy longer than 12 weeks has not been evaluated and cannot be recommended." The "Adverse Reactions" section of the label continued to provide additional information, including a detailed description of the symptoms of tardive dyskinesia and the relationship between adverse reactions and dose and duration of use: "[T]he incidence of adverse reactions correlates with the dose and duration of metoclopramide administration." That section also continued to state that "in most instances, data do not permit an estimate of frequency" for the listed adverse reactions, including tardive dyskinesia.

Although subsequent labeling changes have occurred, the majority of information regarding tardive dyskinesia and EPS risk added in 1985 has remained unchanged. In sum, the Reglan label has adequately, accurately and truthfully addressed the risk of tardive dyskinesia from long-term use since the 1985 labeling change, for over 25 years.

A November 1985 Dear Doctor Letter from Robins to healthcare prescribers enclosed a copy of the revised label and notified them that updates to the Warning section of Reglan's label had been added regarding tardive dyskinesia, similar to labels of all drugs capable of producing tardive dyskinesia. Robins also published

a letter in the New England Journal of Medicine discussing its experience with tardive dyskinesia and Reglan. In addition, in response to doctors' queries, Robins and later Wyeth sent Standard Response Letters to physicians regarding the risks of long-term use, including tardive dyskinesia.

Given that the Agency was taking a class approach for tardive dyskinesia labeling for the neuroleptic antipsychotic agents, it was logical for Robins to await FDA input rather than proceed with an independent label change in a CBE supplement. Additionally, it is my opinion that even prior to the 1985 label, Reglan had reasonable, adequate, truthful and accurate labeling in place to describe its EPS risks and its risk for persistent dyskinesia. Moreover, for the reasons explained above, I disagree with any suggestion that Robins did not inform prescribers about the addition of a tardive dyskinesia warning to the labeling, or that Robins was not transparent with FDA during the drug development and approval process.

## REGLAN Late-1989 - 2001 (WYETH)

When Wyeth acquired Reglan, the tardive dyskinesia warning had been in the label for approximately four years. By 1990, Reglan had been on the market for about 10 years in total, and about six years for the GERD indication. Its safety profile was well understood at that point. Wyeth complied with its regulatory obligations to monitor the safety of Reglan, and it submitted periodic adverse drug experience reports, 15-day reports, annual reports and safety updates to FDA. As part of its safety monitoring, Wyeth followed EPS side effects, including tardive dyskinesia, carefully as important Reglan-related safety concerns.

In 1997, Wyeth reported to the Agency a narrative alert report regarding an increased frequency of reports of EPS in association with the use of Reglan tablets.[12] This report covered the time period of January 1, 1996 through December 31, 1996. The sponsor reported that in this year, they had received six serious reports of EPS that occurred in association with Reglan use versus only one such report the previous year. Because this was an increased frequency, they noted this with FDA. There was no notable pattern to the reports to reflect a need to update the label, and Wyeth informed FDA that it did not consider a labeling change necessary. Wyeth was following this safety issue carefully, and it is my

---

[12] Effective July 1997, FDA revoked the increased frequency expedited reporting requirement based on the Agency's determination that these reports had not contributed to the timely identification of safety problems requiring regulatory action and were no longer necessary for FDA surveillance of postmarketing adverse experiences. June 25, 1997 Final Rule, Federal Register (Vol. 62, No. 122).

opinion that these reports were adequately addressed by the label at that time.  At no time did FDA ask Wyeth to change the label with regard to tardive dyskinesia or EPS more generally after reviewing the increased frequency reports and annual reports.  In my experience, such a modest change in overall AE reporting would not reflect a requirement for a label change.

Ganzini (1993) and Sewell (1994)

Dr. Parisian has cited Ganzini (1993)[13] and Sewell (1994)[14], both of which purport to describe the prevalence of metoclopramide induced tardive dyskinesia and acute extrapyramidal movement disorders, apparently as signals calling into question the accuracy of the Reglan label.  I have reviewed both articles, and I do not agree with this view.  Both claim to have applied the criteria for identifying cases of movement disorders as described in Schooler and Kane (1982), but neither did.  Both studies were extremely sensitive in establishing their dyskinesia diagnoses, as evident by both studies finding high rates of dyskinesia even in untreated control patients.  Ganzini found an extraordinarily high rate (18%) of tardive dyskinesia in untreated control patients and Sewell similarly found a high rate (12%).  In addition, both were small studies and their findings were not statistically significant.  The VA populations enrolled in each of these studies are unique and their results may not extrapolate to the general population.  Ganzini (1993) and Sewell (1994) did not offer any new, meaningful, or relevant information to support any change in the Reglan label, which had a tardive dyskinesia warning since 1985.

Under the Schooler-Kane criteria, Ganzini and Sewell were required to take certain steps to ensure accurate findings of movement disorders, including tardive dyskinesia.  For example, they were required to establish no movement disorders prior to the usage of metoclopramide.  This was not done in either study, however, and so it cannot be determined whether the movement disorders reported in the studies were induced by metoclopramide or were already present.  While patients with known diagnoses of neurologic illnesses that could cause movement problems were excluded, a full neurologic evaluation on the patients to rule out these illnesses was not performed.  This was especially important to do given that those not exposed to metoclopramide in the study had a high rate of movement problems.  Finally, they failed to retest to confirm tardive dyskinesia cases.  Retesting is very important to confirm tardive dyskinesia, as evident in Miller

---

[13] Ganzini et al.  Arch Intern Med 1993;153:1469-1475
[14] Sewell et al. Biol Psychiatry 1994;36:630-632

(2008)[15], which found rates of tardive dyskinesia were much higher on a single test than with two elevated tests.

Ganzini evaluated 53 patients from a VA medical center pharmacy list of patients on metoclopramide, of whom 51 agreed to participate. For comparative purposes, she also found 51 control patients matched by age, gender and diabetes (yes/no, but not matched for severity of diabetes). Her evaluation for tardive dyskinesia was performed at a single point in time (i.e. a point prevalence study), and each group of 51 patients was evaluated by a blinded evaluator for signs of tardive dyskinesia and acute extrapyramidal movement syndromes. Ganzini found that using the Abnormal Involuntary Movement Scale (AIMS) 29% of metoclopramide users met the case definition of tardive dyskinesia versus a remarkably high 18% rate in controls. This difference was not statistically significant. While the difference was attributed to the use of metoclopramide, it is possible that other confounding variables existed between these two small groups of non-randomized subjects.

Sewell was a preliminary report for which no final report was published. It shares many of the same flaws as Ganzini. This brief study report was similar in design to the report by Ganzini. The authors describe 51 metoclopramide treated subjects (from the San Diego VA Medical Center). There were only 34 controls,[16] matched for age, race, gender and diabetes (yes/no, but not matched for severity of diabetes). Similar to the Ganzini approach, patients were rated by blind raters using scales such as the AIMS to identify the presence of tardive dyskinesia. 14 of 51 metoclopramide patients (27%) and 4 of 34 controls (12%) purportedly met the criteria for tardive dyskinesia. The Sewell study, like Ganzini, found a high rate of tardive dyskinesia (12%) even among non-metoclopramide treated subjects. The difference of 27% versus 12% between Reglan subjects and controls was not statistically significant. As with Ganzini, while the difference was attributed to the use of metoclopramide, it is possible that other confounding variables existed between these two small groups of non-randomized subjects.

Labeling from 1985 onwards accurately conveyed that tardive dyskinesia was a known risk associated with Reglan and the Ganzini and Sewell articles do not change this impression in any meaningful way. Additionally, currently available data from AE reports and the relevant medical literature do not support the assertion that Ganzini and Sewell cast doubt on the adequacy, truthfulness and

---

[15] Miller, D.D. et al. Extrapyramidal Side-Effects of Antipsychotics in a Randomised Trial. *British Journal of Psychiatry*. 2008;193:279-288.
[16] There is a discrepancy in the number of controls referenced in Sewell. Table 1 refers to 34 controls, while the text refers to 35.

accuracy of the Reglan label.  Notably, as evident from Dr. Shaffer's 2004 article citing Ganzini (1993) and Sewell (1994), FDA was aware of these publications and their findings.  FDA did not, and has not to this day, added the Ganzini or Sewell references or results to the Reglan label.

Other Studies

Finally, the other literature cited by plaintiffs' experts does not change the truth, accuracy and adequacy of the Reglan label.  For example, Stewart (1992) was a small study (34 metoclopramide patients) that did not measure the risk of tardive dyskinesia but rather only reported on two cases of tardive dyskinesia where subjects had been taking metoclopramide long term and the etiology of the tardive dyskinesia "could not be determined."  The study itself recognized that a major limitation of Dr. Stewart's methodology, that patients were only screened annually, "tend[s] to make the use of metoclopramide appear to be of greater duration."

In addition, Miller and Jankovic (1989)[17] reported on a review of 3,000 patient records of patients who had been seen at their Movement Disorders Clinic over the past 12 years.  Records for sixteen  patients reflected metoclopramide treatment. Ten patients were diagnosed with tardive dyskinesia, a rate of less than one per year.  Miller and Jankovic also reviewed medical literature, finding 1,031 cases of metoclopramide-induced movement disorders, of which almost half derived from one publication, Bateman (1985) (479 reports of EPS in 15.9 million prescriptions of metoclopramide).  A substantial number of the other literature cases discussed by Miller and Jankovic involved the use of the injectable form of metoclopramide at higher doses for cancer chemotherapy and not GERD.  Finally, Miller and Jankovic's statement that the prevalence rate is "probably" greater than 1 in 500 was not a conclusion reached from their own study.  Instead, they cite to Yamamoto (1987) as support for this conclusion.  Yamamoto (1987), however, does not support this conclusion, as it is a single case report.

The "Approximately 1 in 500" Statement in the Label

The 1 in 500 estimate appears in both the Warnings and Adverse Reactions sections of the Reglan label and refers to the risk of acute dystonic reactions associated with the use of Reglan.  The label conveys that these are events that occur acutely within 24 to 48 hours of dosing.  The 1 in 500 estimate does not state

---

[17] Miller, L. G. and Jankovic, J. Metoclopramide-Induced Movement Disorders Clinical Findings with a Review of the Literature. *Archives of Internal Medicine.* 1989;149:2486-2492.

the risk of all EPS, and the risk for tardive dyskinesia is addressed separately in the Warnings and Adverse Reactions sections of the label.

I understand that Dr. Parisian has asserted that the "approximately 1 in 500" statement in the 1981 label was false, inaccurate and/or misleading. I disagree with this assertion. The statement was addressed during the early meetings between Robins and FDA to finalize the label. Over the span of nearly 40 years, FDA has approved the "approximately 1 in 500" statement in the Reglan label numerous times and it remains in the currently approved label.

The "approximately 1 in 500" statement finds support in sources cited in the initial NDA and published literature, as well as in subsequent studies. Support for the approximately 1 in 500 (0.2%) estimate for acute dystonic reactions is found in a 1967 article in French by M. Derbanne, which was cited in the initial NDA.[18] Out of 2,500 observations of metoclopramide administration, the author had observed four cases of EPS syndrome in association with the acute administration of metoclopramide. The authors noted that in two different cases "a state of nervousness arose, with restlessness in the lower extremities and takikinesis, too, from the moment metoclopramide was administered, which regressed rapidly." Taken together, the four cases of EPS syndrome out of 2,500 administrations would be a rate of 0.16%. If the two additional cases of nervousness and restlessness were added, the rate would be 0.24%. Thus, the labeling estimate of approximately 0.2% is completely consistent with the Derbanne article of 1967.

Support for the approximately 1 in 500 rate of acute dystonic reactions is also derived from a report by O.P.W Robinson, also included in the initial NDA.[19] In this article, the author summarizes experience in 1,023 patients from the medical literature who were dosed with metoclopramide as well as 788 patients from a general practitioner survey. EPS side effects were noted in 10 of 1,023 patients from the literature, for a rate of 1%, whereas in the 788 patients in a general practitioner survey, there were no cases. This would overall support a rate of approximately 0.5%, not inconsistent with the approximately 1 in 500 or 0.2% rate. Porter and Jick (1977) also supports the "approximately 1 in 500" figure, as it reported one report of EPS in 758 metoclopramide users. Bateman (1985) noted 479 reports of EPS in 15.9 million prescriptions of metoclopramide in the UK, for an extremely low rate. Even with adjustments for substantial underreporting, the Bateman data are consistent with approximately 1 in 500.

---

[18] Derbanne et al, J Med Clin Pract 1967; 138(5,6):200-213.
[19] O.P.W.Robinson, Post Graduate Medicine 1973;July Supplement:77-80.

Support for the approximately 1 in 500 rate also derives from the POZEN MT100-302 safety study, where a combination metoclopramide/Naproxen product was studied over a period of one year in 1,006 patients who suffered from migraines. In this study, there was one patient among the 1,006 enrolled subjects who had acute dystonia. Thus, the frequency in this study was 0.1% with repeated episodic use of a very low dose of metoclopramide.

The approximately 1 in 500 figure is also supported by an April 19, 1983 letter from Jick to Robins, in which Jick updated results on EPS related to metoclopramide from the Porter and Jick 1977 article. Jick noted in the letter that they had now monitored 1,552 patients who received metoclopramide and found three cases attributable to the drug. Three EPS reports in 1,552 patients also correlates to approximately 1 in 500.

<u>Rate of EPS and Tardive Dyskinesia of Reglan as Compared to Antipsychotics</u>

I disagree with Dr. Seeman's conclusions that the occurrence of EPS in metoclopramide-treated patients is comparable to or higher than that found for the phenothiazines and other dopamine antagonists. Rather, I agree with the statement in the Reglan label, drafted during FDA's close review and revisions to the initial approved label, that "[l]ike the phenothiazines, and related drugs, which are also dopamine antagonists, metoclopramide produces sedation and may produce extrapyramidal reactions although these are comparatively rare (see Warnings)." This statement has been in FDA-approved Reglan for over 30 years, from initial approval through today. Not only was this statement supported by data summarized in the NDA submissions (e.g., Delagrange "Comparative study of neurological tolerance of MCP and Prochlorperazine"), but the published literature also supports this view (e.g., Porter & Jick (1977) found 1 case of EPS in 758 patients given metoclopramide as compared to 22 cases of EPS in 3,827 patients exposed to phenothiazines; Robinson (1973) refers to EPS reactions from metoclopramide as "rare" and compares the 1% that he found with metoclopramide to the 10 to 40% following the use of phenothiazines).

The Matson (2002) study relied upon by plaintiffs' experts was a very small study with only 25 patients exposed to metoclopramide conducted in a unique population who were mentally retarded. It is well known that this population has a predisposition to spontaneous movement disorders, including repetitive motor behaviors. Among other limitations, although the study measured tardive

dyskinesia symptoms among those taking metoclopramide, it did not determine whether they had symptoms first or took metoclopramide first. The results of this study cannot be generalized as plaintiffs' experts have suggested. Recognizing its own limitations, the study concluded only with a recommendation for further study.

The Risk of Tardive Dyskinesia for Diabetics

The available data regarding diabetes as a risk factor for tardive dyskinesia are conflicting, with some studies showing a possible subtle association, and some studies finding no such association. Metoclopramide-specific data regarding this association are confounded further by the fact that metoclopramide is approved for diabetics with gastroparesis. I have not seen any data that persuades me that diabetics who take metoclopramide are at any greater relative risk for tardive dyskinesia than nondiabetics who take metoclopramide. Nor is there any incidence rate that could or should have been included in the label. Labeling for Reglan has appropriately warned about tardive dyskinesia since 1985 for all patients, including diabetics.

The Geriatric Use Label Revision

I disagree with Dr. Parisian's assertions that Wyeth failed to adequately respond to FDA's 1997 rule[20] regarding the addition of a geriatric section to the labeling of all drugs, and her suggestion that the label did not already inform prescribers about the heightened risk of tardive dyskinesia in the elderly. Based on FDA's schedule for geriatric use labeling submissions, Wyeth timely submitted a supplemental NDA to FDA on August 28, 2000.[21] Contrary to Dr. Parisian's suggestion otherwise, Wyeth responded appropriately to FDA's February 28, 2001 letter regarding the geriatric use labeling change, in accordance with FDA's plan for handling the labeling change in light of the December 2001 divestiture of the Reglan tablet NDA to Schwarz Pharma.

In my opinion, there was no new or pertinent information added to the label regarding geriatrics. The geriatric section simply focused on already existing areas of safety concern that might relate to the elderly which were already part of prior

---

[20] August 27, 1997 Final Rule, Federal Register (Vol. 62, No. 166).
[21] FDA Guidance for Industry: Content and Format for Geriatric Labeling, Oct. 2001.

labeling, e.g., the warning that the risk of tardive dyskinesia is highest among elderly women. A sponsor would not, contrary to Dr. Parisian's assertions, mail a Dear Health Care Professional (HCP) Letter for such changes or, more specifically, to tell practitioners that a new "geriatric use" section of the label was underway. That would be a misuse of a Dear HCP letter, which is generally meant to convey new and important safety information. I also disagree that a CBE would have been used for the geriatric update. The prior approval supplement was most appropriate because this was a fairly extensive (over 300 page) submission with clinical results broken out for the elderly regarding pharmacokinetic data and safety data. I believe that Wyeth had an appropriate, thorough, and timely response to FDA's request for geriatric use section in the label, and their ultimate label was not significantly new but rather merely highlighted existing safety information in the label specific to the elderly.

The 2001 Divestiture

In December 2001, Schwarz Pharma acquired from Wyeth ownership of, and all rights to, the Reglan tablet NDA. At the same time, ESI Lederle stopped distributing its generic metoclopramide product, which had been sold under the same NDA as the Reglan tablet NDA. Therefore, because Wyeth no longer held the NDA for Reglan tablet, it no longer had regulatory responsibility for the product and could not revise the label.

**ADDITIONAL FDA ACTIONS/REVIEWS**

The 2000 Cisapride Withdrawal

Cisapride (marketed under the tradename Propulsid in the U.S.) was a prokinetic agent useful for patients with slow bowel function and was available from June of 1993 until its voluntary withdrawal due to cardiac concerns in July of 2000. Cisapride was approved for the symptomatic treatment of heartburn associated with GERD as a first line therapy and became commonly used for this condition. The use of metoclopramide increased following cisapride's withdrawal as it was the sole approved GI motility agent. Also during the last decade, the typical antipsychotics were being replaced by newer atypical antipsychotics which were thought to have less risk for tardive dyskinesia. Related to both of these events, metoclopramide became a more commonly used medication, and therefore a more

common drug-related cause of tardive dyskinesia.[22]  FDA was following these trends carefully.  In my experience with FDA practices and regulations, as part of its determination to remove cisapride from the market, FDA would have carefully considered metoclopramide, including its safety profiles, as an acceptable remaining sole alternative to cisapride.

## 2002/2004 FDA Medical Officer Review of Tardive Dyskinesia and Metoclopramide

As discussed in more detail above, Dr. Shaffer, an FDA medical officer, presented to the medical community data regarding metoclopramide and tardive dyskinesia in 2002 at the Annual Meeting of the American Society for Clinical Pharmacology and Therapeutics.  Dr. Shaffer concluded in his 2002 abstract that tardive dykinesia is "rare" as an adverse effect associated with metoclopramide use, and he listed risk factors linked to tardive dyskinesia — the same risk factors that appear in the Reglan label's tardive dyskinesia warning.  In his 2004 article, Dr. Shaffer reported on an analysis of tardive dyskinesia and metoclopramide use after the withdrawal of Propulsid.  Again, he termed the frequency of metoclopramide-related tardive dyskinesia as "rare."

## The 2004-2005 MT-100 Review

In 2004-2005, Reglan was considered in combination with Naproxen (a drug called MT-100) for the treatment of migraine.  Although FDA determined that the product did not have an acceptable risk/benefit profile for this indication, documentation from the MT-100 review shows a comprehensive review of Reglan's label and a complete awareness of the risks of movement disorders (including tardive dyskinesia) associated with Reglan, and the reporting of those risks in the AERS database and medical literature.  Of note, an FDA presentation at the Advisory Committee meeting noted that tardive dyskinesia was a well-known side effect of Reglan, and that its exact incidence was unknown.  A presentation by FDA safety division also confirmed that FDA was very aware of the risk of movement disorders, including tardive dyskinesia, with Reglan.  A May 5, 2005 memorandum by a Safety Evaluator in FDA's Division of Drug Risk Evaluation noted that cases retrieved from the AERS database, including those cases involving movement disorders related to metoclopramide, reinforced what

---

[22] Kenney et al, J Clin Pharmacol 2008;48:379-384

was shown in the literature and product labeling regarding these adverse events. In addition, a written expert panel report from a group of neurologists and psychiatrists dated May 12, 2005 gave views on the potential approvability of MT-100 with a consensus that the risk of tardive dyskinesia with MT-100 as used in the episodic single dose treatment of an acute migraines was quite small, and should not approximate a risk of even 1%. The members also noted that the current Reglan label "adequately described" the increased risk of tardive dyskinesia in elderly women.

## The 2005 Orally Disintegrating Tablet (Reglan ODT) Approval

FDA approved the Reglan ODT formulation on June 10, 2005, with Schwarz Pharma as the sponsor. The Agency reviewed this new formulation based primarily on pharmacokinetic data, which showed that the new formulation could provide adequate exposures to support efficacy and safety. As part of the clinical review, it was noted that Reglan's efficacy for symptomatic GERD and diabetic gastroparesis had been demonstrated in the original NDA and through more than 20 years of marketing experience. The reviewer also noted that the EPS side effects of Reglan, including tardive dyskinesia, were "well known to practitioners" and "documented in the Warning Section of the label." Of note, even though FDA required two postmarketing studies, FDA did not request any postmarketing studies regarding tardive dyskinesia. FDA, through their approval of Reglan ODT continued to support the truthfulness and accuracy of the Reglan label overall.

## The 2009 Orally Disintegrating Tablet (Metozolv ODT) Approval

FDA approved another orally disintegrating tablet formulation of metoclopramide on September 4, 2009, with Wilmington Pharmaceuticals as the sponsor. At the time of this review, FDA was also requiring a black box warning (see below) for all sponsors of metoclopramide.

## The 2009 FDA Label Update

FDA followed Reglan carefully during the post-Wyeth divestiture, including reviewing all sponsor information as part of its routine business and obligations. Several of these events have been noted elsewhere in this report. As discussed above, in 2004, Dr. Shaffer reported on tardive dyskinesia risks and

metoclopramide use both before and after the market withdrawal of cisapride. FDA continued to monitor and review the long-term use of metoclopramide.

A June 27, 2008 report from the Office of Surveillance and Epidemiology (OSE) to the FDA review division responsible for metoclopramide addressed the risk of movement disorders associated with metoclopramide. The report noted that metoclopramide was being used by more and more patients and that in light of its risk for serious, irreversible movement disorders, its long-term use should be limited to only the most appropriate patients. To help achieve this goal, a black box warning was considered.

FDA's 2008 OSE report cited the Shaffer article, the Ganzini 1993 study (discussed previously) and several other literature findings. The review cited a report by Kenney et al.[23] that found metoclopramide to be the most common drug-related cause for tardive dyskinesia (surpassing haloperidol) from 2000-2006. (Of note, Kenney et al. was not a population study but instead reviewed patients from a movement disorder clinic.) Their findings may have reflected the increased use of metoclopramide following the cisapride withdrawal coupled with a reduced use of haloperidol following the introduction of the atypical antipsychotic therapies. Additionally, the authors noted that there may be a referral bias whereby fewer patients with haloperidol induced tardive dyskinesia were referred to subspecialty clinics like their clinic.

FDA also reviewed a prescriptions claims study by Kaplan et al[24] noting that of all prescription claims for Reglan over a two-year period (January 1, 2002 to December 31, 2004), approximately 20% of patients were treated longer than 90 days. That is not a surprising estimate, as some patients with diabetic gastroparesis or GERD do suffer from fairly severe and recalcitrant symptoms. Moreover, in general, off-label use of drugs is common, and therefore the 20% estimate is not outside the realm of typical rates of off-label use. The fact that some physicians prescribed metoclopramide for use beyond the 12 weeks specified in the label does not mean that the label was false, misleading or inadequate. Physicians are not limited to the approved indication and often decide that individual patients may benefit from taking a drug for indications not on the label.

On February 26, 2009, FDA required changes to the metoclopramide label, including the addition of a boxed warning and revisions to the tardive dyskinesia

---

[23] Kenney et al, J Clin Pharmacol 2008;48:379-384.
[24] Kaplan et al, Pharmcoepidemiology and Drug Safety 2007;16:878-881

warning.  FDA advised sponsors at that time: "Recently published analyses suggest that metoclopramide has surpassed haloperidol as the most common cause of drug-induced movement disorders.[25] A published FDA analysis of metoclopramide utilization patterns showed that prescription claims for cumulative periods longer than 90 days were recorded for a substantial portion of patients in that study.[26]  In addition, we have become aware of continued spontaneous reports to the FDA of tardive dyskinesia associated with metoclopramide use.  Exposure greater than 12 weeks was evident in a majority of these reports.  This information was not available when [metoclopramide product] was granted marketing authorization.  We consider this information to be 'new safety information' as defined in FDAAA."

It is important to note that the finding of metoclopramide surpassing haloperidol as the most common cause of drug-induced movement disorders was influenced by the withdrawal of cisapride from the market in 2000 (leading to more use of metoclopramide), as well as the emergence of second generation antipsychotics (thought to have a lower tardive dyskinesia risk) as reasonable alternatives to the more traditional antipsychotic drugs.  These second generation antipsychotics largely replaced the widespread use of haloperidol and other first generation antipsychotics in part because of their assumed potential for a lower risk for tardive dyskinesia.

The black box warning was added as follows:

---

WARNING: TARDIVE DYSKINESIA

Treatment with metoclopramide can cause tardive dyskinesia, a serious movement disorder that is often irreversible.  The risk of developing tardive dyskinesia increases with duration of treatment and total cumulative dose.

Metoclopramide therapy should be discontinued in patient who develop signs or symptoms of tardive dyskinesia.  There is no known treatment for tardive dyskinesia.  In some patients, symptoms may lessen or resolve after metoclopramide treatment is stopped.

Treatment with metoclopramide for longer than 12 weeks should be avoided in all but rare cases where therapeutic benefit is thought to outweigh the risk of developing tardive dyskinesia.

See WARNINGS

---

[25] Kenney et al, J Clin Pharmacol 2008;48:379-384; Pasricha et al, Nat Clin Pract Gastroenterol Hepatol, 2006 Mar; 3(3): 138-48
[26] Kaplan et al, Pharmcoepidemiology and Drug Safety 2007;16:878-881

In addition to the boxed warning, FDA made revisions to the tardive dyskinesia warning (unboxed) section of the label. In that section, FDA incorrectly added a statement that "one published study reported a TD prevalence of 20% among patients treated for at least 12 weeks." This statement was presumably referring to the Kaplan study, which did not find a 20% prevalence of tardive dyskinesia among metoclopramide treated patients. Rather, this study found that 20% of patients took metoclopramide longer than 90 days. The error was corrected in November 2010, when FDA approved Alaven's labeling supplement which revised this statement to "An analysis of utilization patterns showed that about 20% of patients who used metoclopramide took it for longer than 12 weeks."

The addition of the boxed warning and revised tardive dyskinesia warning did not substantially change the label. The boxed warning largely repeats what was already in the label since 1985. In particular, the following points in the boxed warning and revised tardive dyskinesia warning were already conveyed to prescribers in the pre-2009 label:

- Treatment with metoclopramide can cause tardive dyskinesia
- Tardive dyskinesia can be irreversible
- Risk of developing tardive dyskinesia increases with duration of use and total cumulative dose
- There is no known treatment for tardive dyskinesia
- Risk of developing tardive dyskinesia increases with age, especially in elderly women

Notably, the boxed warning allows for treatment beyond 12 weeks in rare cases where the benefits are thought to outweigh the risk for tardive dyskinesia. That same statement also was added to the unboxed tardive dyskinesia warning section. Diabetes was added as a risk factor, but otherwise the same risk information was presented as in the pre-2009 Reglan label. Of note, the "approximately 1 in 500" statement remained in the label as it has for decades.

In my opinion, while FDA's main purpose was to draw more attention to the already known risk of tardive dyskinesia associated with, in particular, the long-term use of Reglan, the label otherwise did not convey substantially new risk information related to tardive dyskinesia.

The March 19, 2010 Warning Letter

On March 19, 2010, FDA notified Salix Pharmaceuticals, a maker of
metoclopramide ODT, that their product Metozolv ODT was being promoted in a
false or misleading way because their materials did not convey risk information
appropriately, among other concerns.  FDA, in referencing the Warnings section of
the Reglan label (and specifically citing the "approximately 1 in 500" statement),
emphasizes its support of the Reglan label, including the "approximately 1 in 500"
statement, as being truthful and accurate.

## RECENT LITERATURE RELATED TO TARDIVE DYSKINESIA AND METOCLOPRAMIDE

In 2010, Rao and Camilleri published a thorough review regarding metoclopramide
and tardive dyskinesia.[27]  The authors noted that there were no prospective trials of
long-term use of metoclopramide for diabetic gastroparesis or GERD in which the
rate of tardive dyskinesia could be discerned.  In my opinion, these trials do not
exist because long-term placebo controlled trials cannot be ethically performed for
patients with significant GERD unresponsive to standard therapy, or in
patients with significant diabetic gastroparesis.  There are also no approved bowel
motility agents to which to compare.  Therefore, one must rely on reports via
MedWatch, prescription databases, series from involuntary movement clinics, or
case-controlled studies to try and determine how commonly tardive dyskinesia
occurs with long-term metoclopramide use.

Rao and Camilleri noted that guidelines from two national organizations had
reported that the frequency of tardive dyskinesia with metoclopramide use is
between 1-15%.  They evaluated the published literature, and summarized the
various data and findings, including the Ganzini and Sewell publications.  The
authors concluded that the absolute risk for metoclopramide-induced tardive
dyskinesia remains unknown, but it is likely to be less than 1%.

Marianne Mann, MD                    2/14/14
                                     Date

---

[27] Rao and Camilleri, Ailment Pharmacol Thera 2012; 31:11-19